McGuire v. The Commonwealth.

(merits.)

1. A license granted by the United States, under the Internal Revenue Act of July 1, 1862, to carry on the business of a wholesale liquor dealer, in a particular State named, does not, although it have been granted in

consideration of a fee paid, give the licensee power to carry on the business in violation of the State laws forbidding such business to be carried on within its limits.

2. The preceding case affirmed as to the point of jurisdiction; point No. 1 of the syllabus.

A STATUTE of Massachusetts* enacts, that "all buildings, places, or tenements, used for the illegal keeping or sale of intoxicating . liquors, shall be deemed common nuisances," and makes the keeping of such nuisance an offence punishable with fine and imprisonment. McGuire kept and maintained such a tenement at No. 6 Derby Square, Salem, Essex County, Massachusetts, and was indicted, in one of the courts of Massachusetts, accordingly.

His defence was a license granted to him under the Internal Revenue Act of the United States, approved July 1, 1862.† That act provides that no person shall be engaged in, prosecute, or carry on the business of a wholesale dealer in liquor, "until he shall have obtained a license;" and that such wholesale dealer shall for his license pay $100. A proviso to its 67th section, declares that "*no such license shall be construed to authorize* the commencement or continuation of any trade, business, occupation or employment therein mentioned, within any .State or Territory of the United States, in which it is or shall be *specially prohibited by the laws thereof, or in violation of the laws of any State or. Territory.*"

Mr. McGuire's license thus ran:

" To ALL WHOM IT MAY CONCERN:

" This license is granted to McGuire & Co., of the city of Salem, in the County of Essex and State of Massachusetts, to carry on the business or occupation of wholesale dealer in liquors, at No. 6, Derby Square, in the aforementioned city, county, and State, *having paid the tax of one hundred dollars therefor*, conformably to the provisions of an act entitled 'An act to provide internal revenue to support the government, and to pay interest on the public debt,' approved July 1, 1862.

---

* General Statutes, ch. 87.          † 12 Stat. at Large, 459.

"This license to be in force until the first day of September, 1863, provided the said McGuire shall conform to the require-ments of said act, and of such other act or acts as are now or may hereafter be in this behalf enacted.

"Given under my hand and seal, at Salem, this first day of September, A.D. 1862.

"[SEAL.]                                    VINCENT BROWNE,
         "Collector, Fifth Collection District, State of Massachusetts."

McGuire was found and adjudged guilty, and the case having been taken to the Superior Court of the State of Massachusetts, and the judgment below affirmed, the case was now here under the well-known 25th section of the Judiciary Act, authorizing re-examination of a final judg-ment in the highest court of a State, in which is drawn in question the validity of an authority exercised under the United States, the decision being against the validity.

*Messrs. Cushing and Richardson, for McGuire, plaintiff in error.*

I. The attempt of the State of Massachusetts to punish McGuire for doing that which the license of the Federal government expressly empowered him to do, was a nullifi-cation of an act of Congress, and a violation of the para-mount authority of the United States.

The license is not a mere tax, but an authority, sold by the United States, and purchased by the licensee for a sum of money in virtue of which the United States contract with the licensee that he shall have power to do the thing licensed; without which, the license and the money received for it are an act of imposture, fraud, and robbery of its citi-zens by the Federal government.

It is worth while to examine a little the meaning, in law, of this term "license."

In the common law the word is of early, constant, and well-defined use, as applied to the concession of certain rights by the owners of land to a third party.* In this rela-

---

* Brooke's Abridgment, tit. "License;" and for an exhibition of learn-ing on the subject see the case of Thomas v. Sorrell, Vaughan, 330; also, Wood v. Leadbitter, 13 Meeson & Welsby, 843.

tion, the license imparts to the licensee rights, resembling, though not identical with an easement; as, for example, the right to hunt on another man's estate, to cut wood, to fish, or to enjoy participation in a water-course. The licensee possesses property of the class denominated incorporeal hereditaments, and constituting property as rightful as the corporeal hereditament. When such a license is coupled with an interest, by reason of the payment of price, the authority conferred is not a mere permission, but it amounts to a grant, which obliges the grantor, and vests legal property in the grantee.*

II. The only ground on which our rights under the license can be denied is the *proviso* of the 67th section.

Now this clause constitutes a separate provision, of the class of enactments called "saving clauses;" and if it be allowed to have effect, destroys, abrogates, and abolishes whatever there may be of thought, virtue, or use, in the general purview, intendment, and scope of the act. It presents a case of congenital suicide. In such a case, the rule of law is positive, that the saving clause, not the enactment, must be rejected. An illustration is to be found in *Alton Wood's Case*,† where Lord Coke puts it thus: " J. S. is tenant in fee simple of the manor of Dale, or tenant in tail thereof, the reversion to the king; and afterwards this manor is, by express name, given by act of Parliament to the king, saving the right, title, interest, &c., of all person and persons. Whether the estate of J. S. be saved or no? And it seems not; for the saving as to the owner of the land is repugnant, inasmuch as the manor is by express name given to the king; for if the general saving shall extend to the owner of the land, then the act would be made in vain." So in Plowden,‡ the supposed attainder of the Duke of Norfolk was, by act of Parliament, 1 *Mariæ*, " declared to be void and

---

* Webb *v.* Pater Noster, Palmer, 71; Winter *v.* Brockwell, 8 East, 308; Liggins *v.* Inge, 7 Bingham, 682; Rerick *v.* Kern, 14 Sergeant & Rawle, 267; Wood *v.* Manly, 11 Adolphus & Ellis, 34.

† 1 Reports, 47 a.

‡ Walsingham's Case, page 564; cited by Coke, as above.

null *ab initio,* saving the estates and leases made by Edward VI." That saving was held void; for when the attainder was declared to be void, the said saving was against the body of the act, and therefore void. And the like in other cases, where the saving clause is repugnant to the gift or grant, and if allowed to operate, would render it vain and nugatory. We have the rule recognized as far back as the days of the reporter Keilwey,* who speaks of such a proviso as " voide per cause del *contrariositie.*" In the quaint phraseology of the old reporters, such a clause is denominated " a flattering one," and is said by Plowden to be "such as serves to make fools merry;" implying that all persons who, like the defendant in error in this case, rely upon such a saving clause in contradiction to the whole purview of the statute, are flattered with false hopes, and if they become merry in the supposition that such a saving clause does them any good, are merry not according to wisdom.†

It is quite common, in the construction of statutes, to find a subsequent clause, although apparently general in terms, restrained by a preceding clause of paramount exigency and authority.‡

III. The Constitution declares that " all duties, imposts, and excises shall be *uniform* throughout the United States." Shall Massachusetts, because of peculiar *notions* of public policy of her own, evade and escape her due share of the burden of Federal taxation, and throw the same on the States of Maine, New York, Pennsylvania, Georgia, Ohio, Illinois, Iowa, and California? If Massachusetts may do this, cannot the other New England States, which partake more or less of the same peculiar notions, throw off their taxes upon the shoulders of the other States of the Union? If New England may do this, can it not also be done by all the eleven States late in rebellion against the public author-

---

* Keilwey, 174, b; see, also, of a later date, Thornby *v.* Fleetwood, 10 Modern, 115, 408.

† Walsingham's Case, Plowden, 565; Case of the Proxies, Sir John Davies, 2.

‡ Roper *v.* Ratcliffe, 10 Modern, 242, 485.

ity of the Union? Nay, if six States, or even one State, may do this, cannot every and all the States do it, so as completely to nullify the tax provisions of the act of Congress, and so exhibit to the world the ridiculous and contemptible spectacle of an act of Congress, to raise revenue for the support of government and payment of the public debt of the United States, containing within itself a provision for its own utter nullification by the people of each and all of the States?

We suppose that never before in the history of the government did Congress undertake to enact that any one of the States might, at pleasure, exempt itself from the purview of a general act of Congress, laying " duties, imposts, and excises," on the whole United States, and so take away from those taxes the uniformity required by the Constitution. Hence, it cannot be expected that we shall be able to cite any adjudged case to the effect that all such taxes shall be uniform. No legislator imagined it could be otherwise ; no law was passed on which the question could be raised; no court or judge could decide or even debate the point. The converse of this question, to be sure, has been raised politically, but never judicially, so far as regards this court, in the great political discussion of the right assumed by the State of South Carolina to exempt herself from the purview of certain duties on imports, imposed by act of Congress on the whole United States. That, however, was professedly nullification of an act of Congress. The violation of the rule is not improved in quality by transferring the venue to Massachusetts.

The laws of Massachusetts set up here are in violation of the tax power of the United States. It was long ago determined that this power is complete, exclusive, paramount. The time is passed when this doctrine can be disputed. It has been definitively determined by this court.* But these laws declare to be outlawed, and seize and destroy as such, distilled spirits, fermented liquors, and wines, whether for-

---

* The Bank-Tax Case, 2 Wallace, 200.

eign or domestic, subject to the excise laws of the United States as well as its foreign import duties, and so, in effect, extinguish together the taxed article and the tax-power of the United States.

They violate that provision of the Constitution, which declares that, " no State shall make any law impairing the obligation of contracts;" for they deprive the articles of trade in question of all the qualities of property; which extinguishes the subject-matter of contracts, and the contracts themselves, therewith.

IV. The " liquor laws" of Massachusetts have nothing in them of morality, expediency, or of public interest, that should override a license with interest, granted on valuable consideration by the Federal government.

1. It is not true, as alleged, that wines, fermented liquors, or even distilled spirits, are poisons of themselves, otherwise than that everything we eat or drink may be deleterious if used in excess.

2. In view of the example and injunctions of our Saviour and his Apostles, in this respect, it cannot be true that the use of wine is immoral of itself.

3. It is not true, as pretended, that it is our duty to abstain utterly from any object of health or enjoyment because others may abuse it. The effect of this doctrine would be to deprive us of everything desirable, even the dearest of all human relations; since nothing exists for the use of man which some men will not abuse.

4. It avails nothing to make war on the *sale* of distilled spirits; for spirits may be distilled in every man's kitchen, by means as cheap, as accessible, and as manageable as the preparation of a cup of tea or coffee; and if it were not so, other anæsthetic agents exist, which the law cannot reach, such as opium and bang, the familiar means of intoxication used by more than half of the human race, to say nothing of the professed anæsthetic medicaments.

5. The universal prevalence of the use of one or another object of this nature, in all ages, all countries, and all states of society, serves to show that they satisfy a physical exi-

gency of man's organization as imperative as that of food, and of course laws cannot eradicate, although they may regulate, such use.

6. It shocks the sense of mankind, to prohibit absolutely by law the use of wines, fermented liquors, and distilled spirits as a healthful beverage in moderation of use; and the effect of such laws, if rigidly enforced, would only be to introduce by the side of the vice of drunkenness, the worse one of universal hypocrisy.

7. It confounds all distinction of right and wrong, in the acts of instructed men, and in the conscience of the less instructed, to seek to elevate the use of wine to the dignity of an illegal and immoral thing, for the suppression of which all the energies of society should be tempestuously exerted.

The legislation of Massachusetts and Maine is nothing new. It is the exploded folly of England revived. It dates in our ancestral home as far back at least as the period of the Protestant Reformation and the reign of Edward VI. The overthrow of the Catholic Church, and of the moral and religious influence of the regular and secular clergy of that church, compelled legislators to look around for some other means of preventing the excesses of men. They could think of nothing but penal laws. And from that day to this has been kept up the delusion, with more or less hold on society, that penal laws are capable of counteracting immoral tendencies and producing moral conduct.

It needs only to examine the statutes on this subject collected in Hawkins's Pleas of the Crown, c. 78, and Burns's Justice of the Peace, title "Ale Houses," to observe the efforts to substitute in this way penal legislation for moral and religious instruction.

The laws enacted in England, from the time of Edward VI down to that of the Georges, and in the several States of the Union, as exemplified in their worst form by the existing laws of Maine and Massachusetts, demonstrate how wildly, from that day to this, our English and American society has been floundering along from one folly to another in the paths of false theory and unphilosophical legislation, under

the influence of the idea that *statute law* is the all-sufficient remedy of every sort of human infirmity; an idea which is itself the special human infirmity of the well-intentioned people of New England.

The so-called temperance agitation has effected no abatement, in the whole, of the use or abuse of intoxicating drinks, and in the end will probably produce, by recoil, a state of things worse than that which existed before the agitation.    No superiority then over the nation is due to those legislators of Massachusetts, who pretend to be " more pow erful than Nature, wiser than Truth, better than God."

*Mr. Speed, A. G. U. S., and Mr. Reed, A. G. of Massachu setts, contra.*

Mr. Justice NELSON delivered the opinion of the court.

The court below decided that the license received under the act of Congress gave to the defendant no right to keep or sell intoxicating liquors in violation of the State law.

Whatever. might be the effect of this license as to the rights under it, in the absence of other provisions of the act of Congress—a question not involved in the case, and, therefore,.not material to be noticed—it is quite clear that it conferred no right or authority on the defendant below, and hence furnished no defence to the indictment under the law of the State.

The 67th section of the act of Congress enacts, " that no license hereinbefore provided for, if granted, shall be ·construed to authorize the commencement or continuation of any trade, business, occupation, or employment therein mentioned, within any State or Territory of the United States in which it is or shall be specially prohibited by the laws thereof, or in violation of the laws of any State or Territory."

In view of this provision, it is in vain to attempt to give force or effect to the license against the State law; and hence the authority derived from it, upon which the defendant relied for his defence in the court below, fails.

The decision was against an authority set up under an act of Congress, and the case is, therefore, rightfully here under

the 25th section of the Judiciary Act. But as we are of opinion the decision of the court below was right, the judgment must be affirmed.

JUDGMENT AFFIRMED.

[See the preceding case.—REP.]