THE STATE, NATHANIEL WATERBURY, PROSECUTOR, v. WILLIAM K. NEWTON, STATE DAIRY COMMISSIONER.

1. The form of conviction prescribed by the supplement of the Oleomargarine act which went into effect May 1st, 1887 (*Pamph. L., p.* 192), may be used in prosecutions instituted after that date for offences previously committed.

2. Under section 5 of the Oleomargarine act, approved March 22d, 1886 (*Pamph. L., p.* 107), it is not essential to the guilt of a person selling oleomargarine colored with annotto, that he should know that the oleomargarine was so colored.

Waterbury v. Newton.

3. The legislative design in enacting this section was to secure to dairy-men and to the public generally a fuller and fairer enjoyment of their property, by excluding from the market a commodity prepared with the view of deceiving those purchasing it, and of obtaining thereby an improper advantage over rival commodities offered for sale. Hence, it is immaterial that the prohibited commodity is a wholesome food, since it would be equally wholesome if prepared without the deceptive ingredient.

4. The legislature may forbid the sale of counterfeits.

5. Laws passed by the individual states, under their general authority over internal concerns, may incidentally affect foreign and interstate commerce, without conflicting with the constitution of the United States, provided they do not discriminate against such commerce, and are not inconsistent with the acts of congress. .

6. The act of March 22d, 1886 (*Pamph. L*, *p.* 107), rendering penal the sale of oleomargarine colored with annotto, is valid as applied to a sale made in this state by the agent of the manufacturer in Indiana, although the package sold here was that which had been sent by the manufacturer from Indiana to this state for sale.

On *certiorari*.

Argued at February Term, 1888, before Justices VAN SYCKEL, KNAPP and DIXON.

For the plaintiff in *certiorari*, *Joseph D. Bedle.*

For the defendant, *William H. Corbin.*

The opinion of the court was delivered by

DIXON, J. The plaintiff in *certiorari* having, on April 13th, 1887, in Jersey City, sold to George W. McGuire a package of oleomargarine colored with annotto, was convicted before the District Court of said city, of thereby violating section 5 of the "Act to prevent deception in the sale of oleomargarine, butterine or any imitation of dairy products, and to preserve the public health," approved March 22d, 1886. *Pamph. L., p.* 107. This conviction is now before us for review.

One objection made by the plaintiff is, that the record of

conviction is not in the form generally required for summary proceedings of this nature. The form adopted is that prescribed in the amendatory act, which went into effect May 1st, 1887. *Pamph. L., p.* 192. The sale was made before May 1st, but the prosecution was initiated after that date. The legislature has the right to regulate the mode of procedure in prosecutions for antecedent offences, so long as the substantial protections with which the existing laws surround the accused are not impaired. *Cooley's Const. Lim.* 272. The mere form in which the technical record should be made up is not one of these substantial protections, and if the legislature of 1887 has indicated a purpose to make their form applicable to previous sales, that purpose should be enforced. We think the language of the supplement expresses such a design.

Another objection is that it was neither averred nor proved below that the plaintiff in *certiorari* knew that the oleomargarine was colored with annotto, and without such knowledge he could not, it is urged, be guilty of a penal act.

In *Halsted* v. *State*, 12 *Vroom* 552, the Court of Errors laid down the principle that, in regard to statutory offences, the defendant's knowledge of all the physical facts which go to constitute the offence is not essential to guilt, unless made so by a proper construction of the statute itself. The briefs in that case refer to many decisions illustrating the principle. On recurring to the statute now under review, it is plain that there are no words in the enactment showing a purpose to make knowledge a constituent of the penal act. The prohi- bition is in clear and simple terms against the sale of oleomargarine colored with annotto. Unless, therefore, there be discoverable, in what may be deemed the general design of the legislature, an intention to limit this language to cases where the seller is shown to be cognizant of the character of the article sold, the terms of the statute should be effectuated. This general design, as declared both in the title and in the body of the act, is to prevent deception in the sale of oleomargarine, and if we have regard to the public sentiment out of which

the law sprung, it was, we think, not only to avoid, for the sake of purchasers, the danger of their buying oleomargarine under the belief that it was butter, but also, thereby, to secure to the manufacturers of butter those advantages which fair and open competition would afford.    The object was, not to punish acts intrinsically wrong, but to prevent acts which in their results operated unjustly upon others.    This object would be thwarted, if sales could be made with impunity by those ignorant of the ingredients of the article sold.    This interpretation of the law does not savor of undue severity.    No doubt it may impose some hardship upon some innocent vendors; but the means which dealers in these products generally have of informing themselves as to the substances of which they are compounded, are so ample that but few will suffer save through design or negligence, while no practicable degree of caution would protect purchasers; and it is manifest that the legislature has thought proper to incur the slight risk of injustice to the few, in order to escape the greater risk of injustice to the many.

The plaintiff further objects that as oleomargarine, though colored with annotto, is a wholesome article of food, the legislature has no power to prohibit its sale.

If the sole basis for this statute were the protection of the public health, this objection would be pertinent, and might require us to consider the delicate questions, whether and how far the judiciary can pass upon the adaptability of the means which the legislature has proposed for the accomplishment of its legitimate ends.    But, as already intimated, this provision is not aimed at the protection of the public health.    Its object is to secure to dairymen and to the public at large a fuller and fairer enjoyment of their property, by excluding from the market a commodity prepared with a view to deceive those purchasing it.    It is not pretended that annotto has any other function in the manufacture of oleomargarine than to make it a counterfeit of butter, which is more generally esteemed, and commands a higher price.    That the legislature may repress such counterfeits does not admit, I think, of substantial ques-

tion. Laws of like character have of late years been fre-
quently assailed before the courts, but always without success.
A reference to many of them will be found in *Powell* v. *Com-
monwealth*, 114 *Penn. St.* 265; *S. C.*, 8 *Sup. Ct. Rep.* 992,
and *State* v. *Arensberg*, 105 *N. Y.* 123. The validity of the
present act was recognized in this court in *Carter* v. *Camden
District Court*, 20 *Vroom* 600.

Another objection suggested by counsel is, that the applica-
tion of the statute to the present case is a violation of the
provision of the federal constitution, which empowers congress
to regulate commerce among the several states.

The plaintiff in *certiorari* was an agent of the manufacturer
in Indiana, and sold the oleomargarine in the package in
which it had been sent to him by his principal for sale. The
package contained ten pounds only, and there is nothing in
the testimony to indicate that it was sold here for the purpose
of being transported out of the state, or otherwise than it
would have been sold directly to a consumer. Whether the
state can prevent such a sale seems not yet entirely settled
under the decisions of the Supreme Court of the United States.

As far back as *Brown* v. *Maryland*, 12 *Wheat.* 419, that
court decided that a state law requiring an importer to take a
license before he should be permitted to sell imported goods in
the original package, was in conflict with the constitutional
clause prohibiting states from levying duties on imports, and
also with that giving congress the power of regulating com-
merce with foreign nations and among the several states. And
as recently as last March, in *Bowman* v. *Chicago and N. W.
Railway Co.*, 8 *Sup. Ct. Rep.* 689, Mr. Justice Matthews,
delivering the judgment of the court, that a statute of Iowa,
forbidding common carriers to bring intoxicating liquors into
the state, except on consignment to persons licensed to sell the
same, was contrary to the commerce clause of the constitution,
expressed his purpose to refrain from rendering any opinion
on the point, whether the right of transportation from one
state to another includes, by necessary implication, the right
of the importer to sell in unbroken packages at the place

where the transit terminates. Between these cases, there are many decisions, and still more numerous judicial discussions, upon this large and complex theme of commercial regulation, and it is difficult to gather from them all what rules are to control the subject. But so far as I have been able to analyze them, I think these principles are deducible :

First. The power to pass laws which directly regulate foreign or interstate commerce is vested in congress exclusively, except that, in particular instances, where it would be impracticable to enforce rules uniform throughout the country, the individual states may pass such laws, provided they be not inconsistent with the acts of congress. Of this exceptional character have been considered laws relating to pilots (12 *How.* 299), port regulations (21 *How.* 184), ferries (1 *Black* 603 ; 107 *U. S.* 365), bridges over navigable waters (3 *Wall.* 713 ; 113 *U. S.* 205), liens upon vessels (21 *Wall.* 558), the improvement of harbors, bays and rivers (102 *U. S.* 691), wharfage (105 *U. S.* 559 ; 121 *U. S.* 444), and quarantine (118 *U. S.* 455).

Second. Laws passed by the individual states, in pursuance of their general authority over internal concerns, may incidentally affect foreign and interstate commerce, provided they do not discriminate against such commerce, and are not inconsistent with the acts of congress. On this principle, state laws were maintained with respect to their incidental effect upon commerce in the *License Cases,* 5 *How.* 504 ; *Woodruff* v. *Parham,* 8 *Wall.* 123 ; *Hinson* v. *Lott, Id.* 148 ; *Reading R. R. Co.* v. *Pennsylvania* (*Tax on Gross Receipts*), 15 *Id.* 284 ; *Osborne* v. *Mobile,* 16 *Id.* 479 ; *Railroad Co.* v. *Fuller,* 17 *Id.* 560 ; *Sherlock* v. *Alling,* 93 *U. S.* 99 ; *Munn* v. *Illinois,* 94 *Id.* 113 ; *Chicago R. R. Co.* v. *Iowa,* 94 *Id.* 155 *et seq.;* *Machine Co.* v. *Gage,* 100 *Id.* 676, and *Smith* v. *Alabama,* 124 *Id.* 465. But in *Welton* v. *Missouri,* 91 *U. S.* 275 ; *Railroad Co.* v. *Huson,* 95 *Id.* 465 ; *Cook* v. *Pennsylvania,* 97 *Id.* 566 ; *Guy* v. *Baltimore,* 100 *Id.* 434 ; *Webber* v. *Virginia,* 103 *Id.* 344, and *Walling* v. *Michigan,* 116 *Id.* 446, state regulations were adjudged inoperative against for-

eign or interstate commerce, on account of their unfavorable discrimination.

The difficulty of determining whether a state law amounts to an attempt to regulate foreign or interstate commerce directly, and is therefore invalid, under the principle first stated, or only incidentally affects such commerce, and so may be sustained upon the second principle, will be readily surmised, and the fluctuations of the Supreme Court itself, in endeavoring to observe the demarcation may, I think, be perceived, on comparing *Reading R. R. Co.* v. *Pennsylvania* (*Tax on Gross Receipts*), 15 *Wall.* 284, with *Philadelphia S. S. Co.* v. *Pennsylvania*, 122 *U. S.* 326 ; *Munn* v. *Illinois*, 94 *Id.* 113, and following cases, with *Wabash R. R. Co* v. *Illinois*, 118 *Id.* 557, and *Machine Co.* v. *Gage*, 100 *Id.* 676, with *Robbins* v. *Shelby Taxing District*, 120 *Id.* 489. Such a comparison will justify the remark of Mr. Justice Miller, in *Fargo* v. *Michigan*, 121 *U. S.* 230, 240, "with reference to the utterances of this court, until within a very short time past, as to what constitutes commerce among the several states, and also as to what enactments by the state legislatures are in violation of the constitutional provision on that subject, it may be admitted that the court has not always employed the same language, and that all the judges of the court who have written opinions for it may not have meant precisely the same thing."

Adopting these principles as *criteria*, the present statute seems valid with regard to the transaction now under consideration.    Bearing in mind what has been said as to the purport of this law, and noting the declarations of the Supreme Court of the United States in reference to the scope of the police power of the states, the enactment appears to come within this department of legislative authority.    "The police power," says Mr. Justice Field, in the *Slaughter House Cases*, 16 *Wall.* 87, "undoubtedly extends to all regulations affecting the health, good order, morals, peace and safety of society." So Mr. Justice Bradley, in *Beer Company* v. *Massachusetts*, 97 *U. S.* 33: "There seems to be no doubt that the police

power extends to the protection of the lives, health and prop-
perty of the citizens, and to the preservation of good order
and the public morals." And Mr. Justice Harlan, in *Guy* v.
*Baltimore*, 100 *U. S.* 443: "In the exercise of its police
powers, a state may exclude from its territory, or prohibit the
sale therein of any articles which, in its judgment, fairly
exercised, are prejudicial to the health, or which could endan-
ger the lives or property of its people." A statute forbidding
the sale of an article manufactured with the view of deceiving
purchasers, and in a manner likely to accomplish that result,
is within the power thus described.

The application of this statutory prohibition to sales of
oleomargarine brought from other states and not intended for
further transportation, produces only an indirect and inci-
dental effect upon interstate commerce. It may be conceded
that, according to the views expressed in *Brown* v. *Maryland*,
12 *Wheat.* 419. goods imported for the purpose of sale con-
tinue to be the subjects of foreign or interstate commerce
until the imported package is broken up or sold by the
importer, and, until they become thus incorporated with the
mass of property in the state, traffic in them is free from all
legislative regulations, except such as congress may prescribe,
whose silence would only evince a purpose to have the traffic
untrammeled. But later judicial opinions depart somewhat
from these views. Thus Chief Justice Taney, in the *License
Cases*, 5 *How.* 586, said: "Although the gin sold" (being in
the original package), "was an import from another state,
and congress have clearly the power to regulate such importa-
tions under the grant of power to regulate commerce among
the several states, yet, as congress has made no regulation on
the subject, the traffic in the article may be lawfully regulated
by the state as soon as it is landed in its territory, and a tax
imposed upon it, or a license required, or the sale altogether
prohibited, according to the policy which the state may sup-
pose to be its interest or duty to pursue." So, in *Hinson*
v. *Lott*, 8 *Wall.* 148, Mr. Justice Miller, speaking of a state
law which imposed a tax of fifty cents a gallon on liquors in-

troduced into the state for sale (a like tax being levied upon liquors manufactured in the state), said: "As the effect of the act institutes no legislation which discriminates against the products of sister states, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the state, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the states." So, in *Brown* v. *Houston*, 114 *U. S.* 622, coal in New Orleans, transported thither from Pennsylvania by its owners, who resided in Pittsburg, was decided to be subject to taxation in common with other property under the laws of Louisiana, Mr. Justice Bradley saying: "The coal had arrived at its destination and was put up for sale; * * * it was a commodity in the market of New Orleans; * * * it had become a part of the general mass of property in the state." Likewise, in *Robbins* v. *Shelby Taxing District*, 120 *U. S.* 497, Mr. Justice Bradley said: "When goods are sent from one state to another for sale, or in consequence of a sale, they become part of its general property and amenable to its laws, provided that no discrimination be made against them *as* goods from another state." Having thus held that goods brought into one state from another become subject to the general jurisdiction of the former state as soon as they are deposited at their final destination, the court, in *Coe* v. *Errol*, 116 *U. S.* 517, decided that goods, intended for transportation to another state, did not pass beyond the general jurisdiction of the state in which they were, and into the exclusive jurisdiction of congress, as articles of interstate commerce, until they were shipped, or entered with a common carrier for transportation to another state, or were started upon such transportation in a continuous route or journey.

In conformity with these later cases, it seems proper to conclude that the package of oleomargarine with which we are now dealing, became, on its delivery to the consignee in Jersey City, subject to our laws relating generally to all articles of that nature in the state, unless those laws are opposed

to the legislation of congress.  The only federal law with reference to the selling of oleomargarine is that passed August 2d, 1886 (24 *U. S. Stat. at Large, p.* 209), regulating the manufacture, &c., and imposing a special tax on those dealing in it.  This law incorporates with itself section 3243 of the Revised Statutes, which expressly repels the inference that the payment of such a tax will legalize the traffic, and implies that the prohibition of such traffic by state legislation is per- missible.  *McGuire* v. *Commonwealth,* 3 *Wall.* 387 ; *License Tax Cases,* 5 *Id.* 462 ; *Pervear* v. *Commonwealth,* 5 *Id.* 475.

Our opinion is that the state law is constitutional.

None of the objections presented by the plaintiff can pre- vail, and his conviction should be affirmed.