TERRITORY OF DAKOTA *ex rel.* PATRICK MCMAHON *v.* O'CONNOR,
    Deputy Sheriff of Grand Forks Co.

**1. Constitutional Law — Legislative Power — Intoxicating Liq-
    uors—Local Option Law.**

Chapter 70, Laws 1887, providing for the prohibition of the sale of in-
toxicating liquors in the several counties by local option, is not sub-
ject to any of the objections:

1. That it deprives the citizen of his property without due process of
    law.
2. That it conflicts with the Organic Act of the territory.
3. That it conflicts with the revenue laws of the United States, grant-
    ing license to sell intoxicating liquors.
4. That it conflicts with the act of congress prohibiting the legisla-
    ture from passing any law "impairing the rights of private prop-
    erty."
5. That it conflicts with the act of congress prohibiting local or spe-
    cial legislation.
6. That it conflicts with the act of congress in delegating legislative
    power.

**2. Same — Police Power—Intoxicating Liquors, Sale of—Coun-
    ties.**

Such a statute is of a police nature, and a rightful subject of legisla-
tion within the power conferred by the Organic Act, and, being local in
character, may be left to each county to determine when it shall be en-
forced therein.

**3. Same—Statutes—Operation—Penalties for Violation—Habeas
    Corpus.**

Section 5 of the act provided that "in addition to the penalties now
prescribed by law any person   *   *   *   who may sell any intoxicating
liquors without a license having been duly granted as provided by law,
or where the license is granted in violation of this act, shall be re-
strained from so doing by proper injunction." *Held*, on *habeas corpus*,
where the petitioner had been arrested on a complaint before a justice
of the peace charging him with selling intoxicating liquors in violation
of the act, that the objection that the statute provided no penalties,
and could not be enforced, was not well founded.

**4. Same—Enactment—Verity of Official Certificates.**

Where the certificate of the presiding officer of each house shows
that the act was regularly passed, and it was in proper time approved

by the governor, and there is no affirmative record that it did not se-
cure the concurrence of both house, the court cannot say the certifi-
cates of these officers do not import verity

(Argued February 20, 1888; decided February 21; opinion filed February
4, 1889.)

Original proceeding on *habeas corpus.*

*W. E. Dodge, M. W. Greene, Cyrus Wellington,* and *Ball,
Wallin & Smith,* for petitioner.

*C. F. Templeton,* Atty. Gen., *C. B. Pratt,* and *W. A. Selby,*
for respondent.

No briefs on file.

TRIPP, C. J.   The petitioner, Patrick McMahon, was arrested
upon complaint before a justice of the peace of Grand Forks
county, charging him with selling intoxicating liquors in viola-
tion of chapter 70, Laws 1887, known as the "Local Option
Law."   The petitioner, having been bound over to await the ac-
tion of the grand jury of that county, and declining to give bail,
was committed to the jail of said Grand Forks county, and he
sues out of this court a writ of *habeas corpus,* directed to the de-
fendant, O'Connor, as the person having him in custody, alleg-
ing that he is unlawfully restrained of his liberty, in that the
statute upon which this offense is based is unconstitutional and
void, and was never enacted by the legislative assembly of the
territory.

No question is raised as to the right and power of the court
to determine these questions in this manner, and, as the pro-
ceeding is a friendly one, brought as a test case to determine at
an early day, and in a speedy manner, the legality of this stat-
ute, the court has not seen fit to examine into, and will not pass
upon, questions other than those mooted at the argument.

The plaintiff in this proceeding seeks to attack the validity of
chapter 70 of the Laws of the Legislative Assembly, passed at the

seventeenth session, 1887, entitled "An act to prohibit the sale of intoxicating liquors by local option." By the provisions of the act the board of county commissioners are required to submit to the qualified voters of any county, at any general election, the question of prohibiting the sale of intoxicating liquors whenever one-third of the voters of said county, as evidenced by the vote cast at the last preceding election, petition said board therefor; and if a majority of the votes cast at such election shall be "against the sale," it shall be unlawful for such board to issue or grant a license for the sale of intoxicating liquors in such county. Section 5 of this act provides: "Sec. 5. In addition to the penalties now prescribed by law, any person or persons who may sell any intoxicating liquors without a license having been duly granted, as provided by law, or where the license is granted in violation of this act, shall be restrained from so doing by proper injunction issued by the court, or a judge thereof; and any person may secure such injunction, and may use the name of the county as plaintiff in the suit, and no security shall be required, and the district attorney of such county shall in all things conduct such prosecution."

The petitioner contends—*First.* That the act is within the prohibition of the constitution of the United States, in that he is deprived of his property without due process of law. *Second.* That the act is in violation of the organic law of the territory and the statutes of the United States, (*a*) in that it conflicts with the revenue laws of the United States granting licenses to sell intoxicating liquors; (*b*) in that it conflicts with the section of the Revised Statutes of the United States which prohibits the legislature from enacting any law "impairing the rights of private property;" (*c*) in that it conflicts with the statute of the United States prohibiting local or special legislation; (*d*) in that it conflicts with the statute of the United States by delegating the legislative power conferred upon the legislative assembly. *Third.* That the law is inoperative, and cannot be enforced, for the reason that no penalties or punishments are prescribed for its infraction or disobedience. *Fourth.* That the act was never

passed by the legislative assembly, and never became a law of
the territory.

We will consider these objections in the order presented.

It was contended at the argument that this statute was within
the prohibition of the first section of the fourteenth amend-
ment to the constitution, which provides that no state "shall
deprive any person of life, liberty, or property without due pro-
cess of law, nor deny to any person within its jurisdiction
the equal protection of the laws." It need only be stated,
what has been so often decided, that the first amendments of
the constitution were limitations upon the government of the
United States, and upon the powers granted by the constitution
to the national government. But the fourteenth amendment
was intended to be, as its language plainly expresses, a lim-
itation upon the states in their sovereign capacity. This sec-
tion can therefore be of little aid in determining the powers of
the territorial legislature. The territory has no powers, legis-
lative, executive, or judicial, except such as are conferred upon
it by act of congress. It can have over a given subject no
greater powers than congress itself has, and such powers may
be as limited as congress may determine. It has no powers,
in fact, except such as are expressly, or by fair implication,
conferred by congress itself. The sovereignty of the territory,
so called, comes from congress, not the people. If congress
have not the power under the constitution, it can confer none
upon the territory. As has been aptly stated, the territory is
"an outlying province of the national government," subject to
its direct control through congressional legislation, or its in-
direct control through congressional supervision of territorial
legislation. That this national sovereignty over the territories
exists has never been denied. Upon what particular section
of the national constitution such grant of power is based, the
decisions of the court are not harmonious, but, whether it
comes from the power granted "to make all needful rules and
regulations respecting the territory," etc., or from whatever
clause of that instrument the power is derived, it is sufficient.

that the power undoubtedly exists; and it must follow that the legislative power of the territory is limited, not only by the powers of congress granted by the constitution, itself, but it must be confined to the powers also expressly or by necessary inference conferred by statute of congress upon the legislative assembly.  Governed by this rule, and examining the powers conferred upon congress by the constitution, and the limitation upon such powers prescribed by the earlier amendments, we find nearly the same language contained in the fifth amendment as that relied upon at the argument and contained in the fourteenth amendment, to-wit, that "no person shall be deprived of life, liberty, or property without due process of law." Is this law open to the objection that this defendant is deprived of his liberty "without due process of law?"  Without stopping to discuss the phrase "due process of law," upon which so much learning has been expended by the courts, whose reasoning may be read with great interest and profit, it is sufficient here to say that the same clause, in substance, will be found in the bill of rights of every, or nearly every, state of this Union in which the constitutionality of this and similar local option laws has been sustained.  To say by this court that this law is in conflict with such provision of the constitution is to say that the decisions of those states which deny the position taken by counsel here are wrong, and should be overruled, and that congress itself has no power to enact such a law; for if congress has attempted to grant to the legislature of Dakota a power it could not grant, or if this limitation prohibits the exercise of such power so granted by congress, it is because it has not such power itself, or, by such limitation, is restrained from the exercise of such power.  The power to make laws regulating or prohibiting the sale of intoxicating liquors is undoubtedly within the police powers of the state or nation.  Whatever doubt may once have existed, it is now to late to urge that these provisions of limitation in the constitution have reference to or affect the police powers of the state or nation.  Cooley, Const. Lim. 720, authorities cited: *Com.* v. *Kendall*, 12 Cush. 414;

·Com. v. Clapp, 5 Gray, 97; Santo v. State, 2 Iowa, 202; State
v. Wheeler, 25 Conn. 290; People v. Hawley, 3 Mich. 330; Jones
v. People, 14 Ill. 196; State v. Prescott, 27 Vt. 194. It was
questioned after the adoption of the fourteenth amendment
whether its broad language was not intended to prevent the states
from seeking refuge under its police powers to arbitrarily pro-
hibit and restrain the exercise of various trades and employ-
ments as matters of municipal concern; and in Barbier v. Con-
nolly, 113 U. S. 27, 5 Sup. Ct. Rep. 357, a case which went
up from San Francisco, Cal., it was claimed that under this
amendment the municipality had no power to prohibit the com-
plainant from carrying on his business of a public laundry,
in a certain portion of the city, between the hours of 10 at
night and 6 in the morning, and from employing persons about
the premises having infectious or contagious diseases, upon the
ground both that the ordinance was a discrimination as be-
tween citizens of the same municipality, and that it deprived
the petitioner of the right to labor and acquire property. The
supreme court, in denying both these propositions, takes oc-
casion to say: "But neither the amendment, broad and com-
prehensive as it is, nor any other amendment, was designed to
interfere with the power of the state, sometimes termed its 'po-
lice power,' to prescribe regulations to promote the health,
peace, morals, education, and good order of the people, and to
legislate so as to increase the industries of the state, develop
its resources, and add to its wealth and prosperity." It may
then be safely stated that this law is not in conflict with the
constitution of the United States, in that congress itself would
not have power to pass such a law to be enforced in those
places over which it has exclusive powers of legislation, or in
that the limitations of the constitution prohibited the exercise
of such power.

    And the next question for our consideration is, has congress
conferred such power of legislation upon the legislative assem-
bly of the territory? The legislative power of the territory is
conferred by section 1851, Rev. St. U. S., which provides that

"the legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States." This grant of power is a broad one. "All rightful subjects of legislation" is a more extensive grant of legislative power than will be found given to legislative bodies in most of the sovereign states. It not only gives to the legislature the right to legislate upon all rightful subjects of legislation, but it gives to the legislature in the first instance the power of determining what are rightful subjects of legislation; and in the exercise of such power the legislature has determined that the prohibition of the sale of intoxicating liquors by local option is a rightful subject of legislation. Is it a rightful subject of legislation? If it is, then the congress conferred upon the legislative assembly such power, unless the exercise of such power is in conflict with the constitution or some statute of the United States. The question of whether it is righful or not is not to be determined by the expediency or propriety of such legislation, for no two legislatures might agree upon the question of whether such a law was or was not suited and adapted to the needs, habits, or education of the people. The term "rightful" has more the significance of "*lawful*," and the clause must be interpreted to mean that congress grants to the territorial legislative assembly all the powers necessary to be exercised by it in the establishment of a temporary sovereign government. There are certain powers it cannot grant, such as the right to coin money, to regulate commerce, to pass bankrupt laws, etc., for such powers can be exercised by congress alone; but all necessary powers of municipal government must have been and were intended to be granted by the clause. Congress, in the exercise of this power, early created local self-governments out of its "outlying territory," denominated "territorial governments," a name not found in the constitution itself, and it gave to these governments the usual executive, legislative, and judicial powers. The organic acts of the several territories from the earliest history of the country have been of the same general character. They are framed after and founded upon the constitution of the United

States itself, and are singularly like the early state constitutions, and the division into and the separation of the three great departments, and the grants of powers thereto, are much the same in character and distribution. The intention of congress to form a government is in terms expressed in the first section of our organic act, where, after giving the boundaries of the proposed territory, it concludes with the words, "is organized into a temporary government by the name of the 'Territory of Dakota.'" It has sometimes been said that the territory is an "embryo state," and while the congress has never surrendered its right of supervision over the legislation of the territory, yet such power of congress has been very rarely exercised in most of the territories, and never, perhaps, in the history of this territory, except upon direct application of her citizens to supply some omissions, or to relieve from some inadvertence of territorial legislation during the recess of the territorial assembly; so that, in organizing the "temporary government," congress intended such government to have and exercise all the attributes of sovereignty "temporarily," subject only to such supervision as the congress shall choose from time to time to exercise over it. With this residuum of power remaining in congress, dormant, except when expressly exercised, the government of the territory is sovereign in each department, and its organic law is to be construed as its constitution, either in the light of a grant or a limitation of power. Perhaps, as to some portions, it is to have the former, and as to others, it is to have the latter construction. In *Hornbuckle* v. *Toombs*, 18 Wall. 655, Judge BRADLEY, in speaking of territorial governments, says: "As a general thing, subject to the general scheme of local government chalked out by the organic act, and such special provisions as are contained therein, the local legislature has been intrusted with the enactment of the entire system of municipal law, subject, also, however, to the right of congress to revise, alter, and revoke at its discretion. The powers thus exercised by the territorial legislatures are nearly as extensive as those exercised by any state legislature." And in *Clinton* v. *Englebrecht*, Chief Justice CHASE, upon

the same subject, says: "The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of national authority, and with certain fundamental principles established by congress." 13 Wall. 441.

The legislatures of all the territories, under organic acts almost like our own, have exercised and granted to public corporations to exercise the right of eminent domain, one of the highest prerogatives of sovereignty, and this not only with the silent acquiescence of congress and the people, but by the solemn adjudication of the courts. *Swan* v. *Williams*, 2 Mich. 427.

It is too late now for the courts to hold that the territory is other than a *temporary sovereign government,—temporary*, in that its organic laws and its very existence are subject to the paramount will of congress, its creator; *sovereign*, in that its executive, legislative, and judicial powers are unlimited except by the terms of the constitution or its organic law. When congress created the temporary sovereign government of the territory, it intended to confer upon it such legislative powers as are usually exercised by sovereign states. Police powers are among the more common powers exercised by the sovereign states. Mr. Cooley defines police powers to be: "The police of a state, in a comprehensive sense, embraces its whole system of internal regulation by which the state seeks not only to preserve the public order, and to prevent offenses against the state, but also to establish, for the intercourse of citizens with citizens, those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others." Cooley, Const. Lim. 706. Blackstone defines it to be (4 Bl. Comm. 162) "the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners; and to be

decent, industrious, and inoffensive in their respective stations."
Jeremy Bentham has this definition: "Police is in general a
system of precaution, either for the prevention of crimes or of
calamities. Its business may be distributed into eight different
branches: (1) Police for the prevention of offenses; (2) police
for the prevention of calamities; (3) police for the prevention of
endemic diseases; (4) police of charity; (5) police of interior
communications; (6) police of public· amusements; (7) police
for recent intelligence; (8) police for registration." Bentham's
Works, pt. 9, p. 157. Chief Justice SHAW says: "The power
we allude to is rather the police power, the power vested in the
legislature by the constitution to make, ordain, and establish all
manner of wholesome and reasonable laws, statutes, and ordi-
nances, either with penalties or without, not repugnant to the
constitution, as they shall judge to be for the good and welfare
of the commonwealth, and of the subjects of the same. It is
much easier to perceive and realize the existence and sources
of this power than to mark its boundaries, or prescribe limits
to its exercise." Cooley, Const. Lim. 707, 708. Judge RED-
FIELD says: "This police power of the state extends to the pro-
tection of the lives, limbs, health, comfort, and quiet of all per-
sons, and the protection of all property within the state. Ac-
cording to the maxim ' sic utero tuo ut alienum non lædas,' which
being of universal application, it must, of course, be within the
range of legislative action to define the mode and manner in
which every one may so use his own as not to injure others.
* * *  There is also the general police power of the state,
by which persons and property are subjected to all kinds of re-
straints and burdens, in order to secure the general comfort,
health, and prosperity of the state; of the perfect right in the
legislature to do which no question ever was, or, upon acknowl-
edged general principles, ever can be, made, so far as natural
persons are concerned." Thorpe v. Railway Co., 27 Vt. 149.
The power to prohibit the sale of intoxicating liquors not only
comes within these definitions, but it has been frequently so
held by the courts. Mr. Cooley says: "In the American con-

stitutional system the power to establish the ordinary regulations of police has been left with the individual states, and it cannot be taken from them, either wholly or in part, and exercised under legislation of congress. Neither can the national government, through any of its departments or officers, assume any supervision of the police regulations of the states. All that the federal authority can do-is to see that the states do not, under cover of this power, invade the sphere of national sovereignty, obstruct or impede the exercise of any authority which the constitution has confided to the nation, or deprive any citizen of rights guarantied by the federal constitution." Cooley, Const. Lim. 708, 709. The very theory upon which our system of government is based, of allowing each locality to govern its municipal affairs in its own way, and that the congress shall legislate upon affairs pertaining to the good of the whole people, made it necessary that the people of the territories should have a local government; and its matters of police were among the first and necessary powers committed to such local government. If, then, the power of local option pertains to the police, it is a rightful subject of legislation, and the power to make such law was given by the organic act; but, irrespective of such logical conclusion, to which we must arrive, it would be a bold and backward step for the court to say, in the face of modern legislation upheld by the highest courts of the states and of the nation, that local option in matters of intoxicating liquors is not a "rightful subject of legislation." Would not the general conclusion be a most just and natural one, that the exercise of such a power, which, in the states under a general grant of power or exercise of power no broader or more general in character than our own, has been almost uniformly sustained by their highest courts, and more recently by the supreme court of the United States, is not in conflict with constitutional powers? Would we not, I repeat, more naturally conclude that congress, with such legislative and such judicial determinations before it, in granting to the territorial legislature the power over all "rightful subjects of legislation," intended it to have the right to exercise all such

powers as were usually exercised by other legislative bodies un-
der similar grants of sovereign power? That congress had the
power to grant, and that it did grant, such power to the terri-
torial assembly, we have no doubt; and the legislature has full
power to exercise such power unless it is prohibited by some other
or later act of congress itself.

It is contended that the act is in conflict with the revenue laws
of the United States granting license to sell intoxicating liquors.
This question is determined by the license cases found, *eo nom-
ine, McGuire* v. *Com.*, 3 Wall. 387, and *License Tax Cases*, 5
Wall. 462, in which the supreme court holds that these laws are
enacted for revenue merely, and that, whether the tax be collected under the form of a tax or license, it is in fact a tax, and
not a license or permission to perform the act. In the case
last above cited, the court says: "The granting of a license,
therefore, must be regarded as nothing more than a mere form
of imposing a tax, and of implying nothing except that the
licensee shall be subject to no penalties under national law if
he pays it.  *  *  *  But, as we have already said, these
licenses give no authority. They are mere receipts for taxes."
But it is contended that the statute of 1864, which in terms
provided "that no license provided for in the act should be con-
strued to authorize any business within any state or territory
prohibited by the laws thereof," was amended by the Revision
of 1878, by leaving out the word "territory," thereby intending
to give the construction that in the territories the acts should
give a license. Whatever of force there might have been to this
argument, an examination of the entire title on revenue, in which
this section occurs, reveals the fact that the word "state" is
made to include "territory." The first section of chapter 1, tit.
"Internal Revenue," Rev. St. U. S., provides that "the word
'state,' when used in this title, shall be construed to include the
territories and the District of Columbia where such construc-
tion is necessary to carry out these provisions." And an in-
spection of the entire title shows that the word "state" is used
throughout the chapter to include "territory," as in section

3200, where it is provided that the collector may seize lands of a delinquent in "any state," and in section 3211, where the secretary of the treasury is authorized to designate United States depositories in "any state," etc.

The objection is equally untenable that the act "impairs the rights of private property." The act contemplates nothing beyond the prohibition of the sale of intoxicating liquors. It does not seek to confiscate, destroy, or prevent any lawful use of intoxicating liquors, or to lessen the value of such property, or of other property used in or about the sale of such liquors, except in so far as a depreciation in value may result from the prohibition of the sale. Such impairing of the rights of private property must always more or less result from the enforcement of police regulations. The exercise of the police power which establishes fire limits, regulates markets, controls gunpowder and combustible materials, fixes the speed of trains and vehicles, establishes stands for hackney coaches, prohibits cattle from running at large, and otherwise interferes with the use of private property for the public good, in a similar way impairs the rights of private property. "The right of private property" is always subject to the fundamental law that "no man may so use his own property as to injure another." Upon this fundamental principle rests the whole police power of our government, and whether the use of private property in a particular manner does injure another is the test of every police regulation. But this is not a question for the courts where the legislation is honestly and fairly what it purports to be. It is properly an exercise of legislative power; and though the courts might differ materially from the legislature as to the wisdom or the propriety of the legislation, and even whether in fact the exercise of one's right in private property did result in public injury,—whether certain foods were unwholesome; whether certain drinks were deleterious; or whether certain materials and compositions were dangerous,—yet the determination of such questions is for the legislature, and not for the judiciary, and its decision is binding on the courts, except in cases where, un-

der guise of the exercise of police power, the legislature has wrongfully impaired private rights; so that as long as the courts can say the legislative act provides only for the exercise of police power, so long are they bound to uphold the validity of such act, and to say it does not "impair private rights." It was upon this ground the case of *Mugler* v. *Kansas* was so strongly contested in the supreme court of the United States. 123 U. S. 623, 8 Sup. Ct. Rep. 273. Counsel for Mugler contended that the Kansas act, in prohibiting the manufacture of intoxicating liquors, impaired private rights; that a private individual had the right to manufacture beer for his own use; that he was not thereby using his own property to the injury of others. It was conceded by counsel that the state had the power to prohibit the sales of intoxicating liquor, and to prohibit the manufacture for sale, but that it had no right or power to prohibit its entire manufacture; that "the doctrines of the commune give to the state the right to control the tastes, appetites, and habits of the citizens. His dress, food, drink, domestic relations, are controlled and regulated by the state. 'The state is everything, the individual nothing.' In order to make him a useful citizen and tax-payer, the state exercises a surveillance over all that he is and has." That, "on the other hand, our system of government, based upon the individuality and intelligence of the people, does not claim to control the citizen, except as to his conduct to others, leaving him the sole judge as to all that only affects himself." But the court, in answer to this argument, says: "It will be observed that the proposition, and the argument made in support of it, equally concede that the right to manufacture drink for one's personal use is subject to the condition that such manufacture does not endanger or affect the rights of others. If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in *Munn* v. *Illinois*, 94 U. S. 113, 124, while power does not exist with the whole peo-

ple to control rights that are purely and exclusively private, government may require ' each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another.' But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions so as to bind all must exist somewhere, else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety. * * * If, therefore, a state deems the absolute prohibition of the manufacture and sale within her limits of intoxicating liquors for other than medical, scientific, and manufacturing purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, override the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the constitution to another department. And so if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question." 123 U. S. 660–662, 8 Sup. Ct. Rep. 296. The doctrine of this case has been again examined in the case of *Powell*

v. *Pennsylvania*, 127 U. S. 678, 8 Sup. Ct. Rep. 992, 1257, where
the legislature of Pennsylvania undertook to punish for the man-
ufacture of oleomargarine. It was offered at the trial to prove by
experts that "it was made from pure animal fats; that the article
was substantially identical with that produced from milk and
cream; and that it was a wholesome and nutritious food." The
offer as expressed was made to show that the statute was not a
proper exercise of police power, and that it deprived the defend-
ant, under the state constitution, of the lawful use "of his prop-
erty, liberty, and faculties, and destroys his property without
making compensation." The state court denied the offer, and the
supreme court of the United States, in affirming the decision of
the lower court, says: "Whether the manufacture of oleomar-
garine, or imitation of butter, of the kind described in the stat-
ute, is or may be conducted in such a way or with such skill
and secrecy as to baffle ordinary inspection, or whether it in-
volves such danger to the public health as to require, for the
protection of the people, the entire suppression of the business,
rather than its regulation in such manner as to permit the
manufacture and sale of articles of that class that do not con-
tain noxious ingredients, are questions of fact and of public
policy which belong to the legislative department to determine.
And as it does not appear upon the face of the statute, or from
any facts of which the court must take judicial cognizance, that
it infringes rights secured by the fundamental law, the legis-
lative determination of those questions is conclusive upon the
courts. It is not a part of their functions to conduct investiga-
tions of facts entering into questions of public policy merely,
and to sustain or frustrate the legislative will, embodied in
statutes, as they may happen to approve or disapprove its de-
termination of such questions. * * * If all that can be
said of this legislation is that it is unwise or unnecessarily op-
pressive to those manufacturing or selling wholesome oleomar-
garine, as an article of food, their appeal must be to the legis-
lature, or to the ballot-box, not to the judiciary. The latter
cannot interfere without usurping powers committed to another

department of government." See, also, *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Patterson* v. *Kentucky,* Id. 501; *U. S.* v. *Dewitt,* 9 Wall. 41.

.Courts are reluctant to declare legislative enactments unconstitutional and void. As stated by Chief Justice WAITE, in *Sinking Fund Cases,* 99 U. S. 718: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." See, also, *Fletcher* v. *Peck,* 6 Cranch, 87, 128; *College* v. *Woodward,* 4 Wheat. 518, 625; *Livingston* v. *Darlington,* 101 U. S. 407.

That it is in conflict with the statute of the United States prohibiting special legislation, or that it is a delegation of legislative power, might have been urged with some plausibility in the earlier days of American jurisprudence. It is now too late to argue the question as an original proposition. Matters affecting the police, such as the sale of intoxicating drinks, running at large of cattle, and kindred questions, are so differently regarded in different localities that it has been by no means uncommon to submit them to the people of the locality to be affected by their exercise, and laws so submitting such questions have been almost uniformly sustained, though not always upon the same ground. Many of the authorities in a case like the one before us hold that the law was perfect in all its parts, and complete, so far as any further action of the legislature was concerned, when it was approved by the executive, and that its adoption or rejection by the voters, or, rather, the favorable or unfavorable vote as to execution of the law, was a contingency merely provided for by the legislature as to the time when it should become operative. Mr. Justice AGNEW, in *Locke's Appeal,* 72 Pa. St. 491, thus expresses it: "The law did not spring from the vote, but the vote sprang from the law, and the law alone declared the consequence to flow from the vote. The assumption that the act is not a law till enacted by the people

is the foundation of the argument, and with its fall the super-
structure vanishes.    The character of this law is precisely that
of hundreds of others, which the legislative will makes depend-
ent on some future act or fact for its operation.    To assert that
a law is less a law because it is made to depend on a future
event or act is to rob the legislature of the power to act wisely
for the public welfare, whenever a law is passed relating to a
state of affairs not yet developed, or to things future, and im-
possible to be fully known."    See, also, *State* v. *Court Common
Pleas*, 36 N. J. Law, 72; *Village of Gloversville* v. *Howell*, 70
N. Y. 286; *Fell* v. *State*, 42 Md. 71; *Com.* v. *Weller*, 14 Bush,
218; *State* v. *Wilcox*, 42 Conn. 364; *Boyd* v. *Bryant*, 35 Ark.
69; *Com.* v. *Bennett*, 108 Mass. 27; *Cain* v. *Commissioners*, 86
N. C. 8; *Bancroft* v. *Dumas*, 21 Vt. 456; *Smith* v. *Janesville*,
26 Wis. 291.    But the theory of self-government, upon which
our whole fabric of government is founded, seems to furnish the
proper and natural solution of the question.    These laws are
local in character.    Different localities may be differently af-
fected by such legislation, and from the early history of our co-
lonial governments questions affecting the locality have been
left to the decision of the people interested therein.    The New
England town of to-day is a small republic in everything per-
taining to local government, the county is an aggregation of
towns, and the state an aggregation of counties with 'sovereign
powers.    The town or municipality does not concede that it de-
rived its authority through the munificence of the state in the
descent of power, but it claims to have had such power anterior
to the state; that the state is the creation of the town, rather
than that the town is the creation of the state.    Mr. Cooley states
the doctrine very clearly when referring to the so-called delega-
tion of legislative power to municipalities: "The legislature,
in these cases, is not regarded as delegating its authority, be-
cause the regulation of such local affairs as are commonly left
to local boards and officers is not understood to belong properly
to the state; and when it interferes, as sometimes it must, to
restrain and control the local action, there should be reasons of

state policy or dangers of local abuse to warrant the interposition." Cooley, Const. Lim. 229.

It would seem to be conceded that the legislature has power to authorize or allow municipal governments by charter to exercise all the ordinary police powers, including the regulation and prohibition of the sale of intoxicating liquors. If this be so, it is certainly far less a delegation of power to enact for such locality a perfect and complete statute, leaving to its people only the power to fix the date when it shall come into force, than to give to such locality complete control and power over such legislation. The law being conceded to belong to the police powers of the government, and to be local in character, it may with propriety be left to the county to determine when it shall and when it shall not be enforced.

The objection that the statute provides no penalties, and cannot, therefore, be enforced, is answered by examination of the statute which, in terms and by implication, continues the former penalties in force, and provides an additional remedy for the restraint of such sale by injunction. See section 5, *supra*. The language of the section is too plain to admit of doubt. The legislature clearly intended to apply the penalties of the former law to a disobedience of the latter law. The former law is in no manner repealed, in terms or by implication, but was in several sections amended by the same legislature, and continued in full force. Chapters 71, 72, etc., Laws 1887. By reference to the penalties prescribed by a former statute, and by providing others "in addition thereto," the statute must be construed as including and as having incorporated into it the penalties of the statute referred to. *Turney* v. *Wilton*, 36 Ill. 385; *State* v. *Wilcox*, 19 Amer. Rep. 536.

The last point raised by counsel, to-wit, that the law never passed the two branches of the legislature in the manner prescribed by law, and which was ably and ingeniously presented, can receive but a passing notice here. How far, under our law, a court has power to go behind the statute, as it appears to be approved by the executive, and examine the journals and other

records to determine the regularity and validity of its enactment, we are not required here to determine; for, while from the arguments of counsel there appear to be irregularities in the bill and mistakes in reference to the bill, in the various stages of progress through the two houses, and on its way to the executive, exhibiting to the court an almost inexcusable haste and want of care in the consideration of so important a measure, yet we are clearly of the opinion that no such omission was made or error committed as would render invalid the act in question, if we were to go behind the act as approved to consider its effect. The certificate of the presiding officer of each house shows the act to have been regularly passed by that body. The journals are in many cases silent as to the action of the house when they should have spoken. The act was in proper time approved by the governor, and it is sufficient for this case to say it will not declare the law invalid by reason of the mere failure of the journals to record its passage, and, in the absence of any affirmative record that it did not secure the concurrence of both houses, we cannot say the certificates of the sworn officers of the two bodies of the legislative department do not upon their face import verity. The writ is discharged, and the defendant is remanded to the officer having him in charge. All the justices concurring, except Justice THOMAS, not voting.